[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-10419
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCT 20, 2008
THOMAS K. KAHN
CLERK

Agency No. A96-264-857

ZEHRA VELLANI,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(October 20, 2008)**

Before WILSON, PRYOR and FAY, Circuit Judges.

PER CURIAM:

Zehra Vellani, a citizen of Pakistan, appeals the order by the Board of Immigration Appeals ("BIA") affirming the immigration judge's ("IJ") order of removal and denial of asylum and withholding of removal under the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1158, 1231(b)(3), and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT"), 8 C.F.R. § 208.16(c). Vellani argues that (1) substantial evidence does not support the IJ's and BIA's conclusions that she did not have a well-founded fear of future persecution because she did not establish that she could not relocate reasonably to another part of Pakistan and (2) the IJ violated her due process rights by failing to remedy the translation problems that pervaded her asylum hearing and refusing to consider the late-filed affidavit and telephonic testimony of an expert. For the reasons set forth below, we deny the petition.

## I. FACTS

On September 6, 2003, Vellani entered the United States as a non-immigrant fiancée with authorization to remain until December 5, 2003, pursuant to INA § 101(a)(15). On September 2, 2004, Vellani filed an application for asylum, withholding of removal, and CAT relief, on the ground that she had been and would be persecuted on account of her membership in a particular social

2

group.  On January 11, 2005, the Department of Homeland Security ("DHS") issued a notice to appear ("NTA") charging that Vellani was removable as an alien who had overstayed her fiancée visa, pursuant to INA § 237(a)(1)(B).

In an affidavit that Vellani submitted to the immigration court, Vellani stated that she was a practicing Muslim.  Her "family and . . . society" did not permit premarital sex.  Her ex-fiancé, "Amin," lived in the United States.  She became engaged to him when he visited Pakistan.  After the engagement, Amin returned to the United States alone to arrange a visa for Vellani.  Later, Vellani, accompanied by her mother, joined Amin in the United States.

Vellani and her mother slept on an extra bed in Amin's home.  Soon after they arrived, Amin beckoned Vellani to his bedroom for a private conversation.  Amin asked Vellani to undress so that he could see her naked and asked to have sex with Vellani.  When she refused, he became angry.  Vellani eventually agreed to remove her shirt.  Vellani told her that she was fat and must lose weight.  On a following day, Amin again beckoned Vellani to his room.  Amin asked to have sex with Vellani, but she refused on the ground that they were not yet married.  Amin, forced Vellani to perform oral sex on him.  For the next ten days, Amin forced Vellani to perform oral sex on him daily.

Vellani and her mother then traveled to Vellani's uncle's house, which also

was in the United States, to prepare for the wedding ceremony. Approximately ten days later, Amin contacted Vellani's brother, who remained in Pakistan, and informed Vellani's brother that he would not marry Vellani because she had a boyfriend. Vellani's brother agreed that he, too, would refuse to marry a girl that had a boyfriend. Vellani's brother relayed the information to Vellani and accused her of dishonoring the family. Vellani had never had, and did not then have, a boyfriend. When Vellani called Amin to discuss the situation, Amin stated that he would not marry her because she was "a loose woman" who had had sex with Amin before their marriage and threatened to tell Vellani's family of their premarital sex. When Vellani and her mother called Vellani's brother to explain the situation, he stated that Vellani was "in the wrong," had ruined the family's honor, and should not return to Pakistan. Indeed, Vellani's brother stated that he wanted to "sever ties" with Vellani and even moved his own family from Vellani's family home so that Vellani's disgrace would not affect his daughter.

Vellani's mother eventually returned to Pakistan, but Vellani remained in the United States. Every time she spoke with her brother, it became clearer that she could not return to Pakistan because he "was waiting for [her] there," Amin's family would make her life impossible, and her community already had branded her "an adulterer and a woman of loose moral character." If she returned, she

would not be able to remarry or to support herself.

The U.S. Department of State Pakistan Country Report on Human Rights Practices for 2003 that Vellani submitted to the immigration court stated that, in Pakistan, women were considered subordinate, domestic and sexual violence was widespread, and "honor killings" were a problem. Many male relatives killed female relatives who were suspected of adultery or were "defile[d]" through rape. Authorities estimated that more than 700 honor killings had occurred that year. Likewise, the U.S. Department of State Pakistan Country Report on Human Rights Practices for 2005 that Vellani submitted to the immigration court stated that local human rights organizations documented 1,211 cases of honor killings in that year, and suspected that many more went unreported. Furthermore, Amnesty International documents from 2002 and 2003 that Vellani submitted to the immigration court stated that so-called honor killings were carried out by men who believed that their wives, daughters, or sisters had damaged the man's honor, even by being raped. Indeed, Pakistani men would themselves be deemed dishonorable if they did not restore their honor through committing honor killings. The Pakistani government did not take any measures to ban the practice of honor killing or to ensure that the perpetrators were held accountable. Indeed, Pakistani law allowed criminal prosecution for murder only if the murder victim's family

requested such, which frequently did not happen in honor killing cases.

At a hearing on December 20, 2005, an IJ set the deadline to file additional exhibits at May 1, 2006. On April 21, 2006, Vellani filed a motion for a continuance of her asylum hearing and a motion to extend the time to file additional exhibits, asserting that her father recently had died, she recently had given birth, and her expert witness, Professor Riffat Hassan, had been out of the country. On April 24, 2006, the IJ denied the motion for a continuance, but granted the motion to extend the time to file and reset the deadline to file additional exhibits at May 19, 2006. Also on April 21, 2006, Vellani filed a motion for leave of court to present telephonic testimony at her asylum hearing, asserting that Hassan, who would testify on honor killings in Pakistan, lived and worked in a different state. The IJ denied the motion.[1]

On May 26, 2006, after the submission deadline had passed, Vellani filed the affidavit of Hassan, in which Hassan stated that Amin's accusation that Vellani

---

[1] We note that the IJ's orders on these motions are not contained in the administrative record. Rather, the motions themselves include handwritten notations on their bottom right-hand corners regarding the disposition of the motions. In her brief on appeal to the BIA, Vellani claimed that the IJ did not rule on these motions. Vellani claimed that the additional documents remained due on May 1, 2006, and that Hassan was waiting by the telephone to give her testimony on the day of the asylum hearing. We need not resolve this discrepancy, however, because the IJ's refusal to consider the affidavit and letter that Vellani submitted out of time, and refusal to hear Hassan's telephonic testimony, did not effect the outcome of Vellani's case, as discussed below.

6

had engaged in immoral behavior was a sufficient ground for her honor killing by her male relatives. Vellani's denial of the accusation would carry no weight in Pakistan. The fact that she had sought legal recourse would weigh against her. It was highly probable that "grievous bodily harm" would be done Vellani by her brother and/or Amin's relatives and associates if she returned to Pakistan.

At her June 12, 2006, asylum hearing, the IJ acknowledged that a Urdu language translator was present, and Vellani stated that she could speak and understand Urdu. Vellani indicated that Hassan was prepared to testify telephonically, as she currently was in Pakistan. The IJ stated that he did not accept telephonic testimony. The DHS then objected to the late-filed affidavit of Hassan, on the grounds that it was late and that Hassan was not available for cross examination. The IJ rejected Hassan's affidavit.

Also at the hearing, Vellani testified that, the day after her and her mother's arrival in the United States, Amin forced Vellani to undress in front of him. Two days after her arrival, Amin forced her to have oral sex with him. At this point in her testimony, Vellani's counsel indicated to the IJ that Vellani's friend who had accompanied her believed that the translator may have been using the Hindi, rather than Urdu, word for "sex" and requested permission to voir dire the translator on this matter. The IJ allowed Vellani's counsel to ask the translator what version of

7

"sex" he was using. The translator responded that he was using the Urdu word for "sex." Vellani continued to testify that, two days after her arrival in the United States, Amin forced her to perform oral sex on him. For the next six days, he continued to force her to perform oral sex on him. On these days, Amin wanted to have "physical sex" with Vellani, but she always refused. Later, after Vellani and her mother had traveled to her uncle's house to prepare for the wedding ceremony, Amin called Vellani's brother and claimed that Vellani had a boyfriend and broke off their engagement. When Vellani's brother relayed the news to Vellani, he told her, "If you come in front of me, I will kill you and I'll not tolerate that from you."

Vellani currently was married to another man and had a son by him. Her husband did not know of the sexual assault, or the particulars of her asylum case, but rather believed that Vellani herself broke off the engagement to Amin for another reason. If her husband learned of the sexual assault, he would divorce her and take their son away from her. Even if he did not learn of the sexual assault, he would not move to Pakistan with her because his family lived in the United States.

If she returned to Pakistan, she feared her brother would kill her or she would be shunned by the community. Because women cannot live alone in Pakistan, she would become a "prostitute type[]" or would be taken to police. When asked if there was any place in Pakistan that she could safely live, Vellani

8

testified that "there was no way" she could return to any part of Pakistan and that returning would be so bad that she would have to commit suicide.

On cross examination, Vellani testified that her brother was the only person in Pakistan that would try to kill her. The community, however, would not let her live "peacefully," whether they knew of her disgrace or not.

The IJ denied Vellani's application and granted voluntary departure. In his oral decision, the IJ found that Vellani was not credible, in part because she hesitated before giving her answers and thereby seemed to search for the "right" answer. The IJ also stated that Vellani could not demonstrate that she had a well-founded fear of future persecution, as the IJ was not convinced "in any way" that there was absolutely nowhere that Vellani could live in Pakistan. Because she could not satisfy her burden of proof for asylum, Vellani could not satisfy the higher burden of proof for withholding of removal, and, because she had not presented any evidence of being tortured, she did not merit CAT relief.

Vellani appealed the IJ's decision to the BIA. In a brief, Vellani argued that the IJ's adverse credibility finding was clearly erroneous, in that the record demonstrated that Vellani could not understand the translator and hesitated before answering for this reason only. Specifically, the translator used a very formal version of Urdu that Vellani could not comprehend, as illustrated by her confusion

9

over the word for "sex" used by the translator. Furthermore, the IJ erred in finding that Vellani did not prove that she could not relocate within Pakistan, as Vellani clearly demonstrated that, even were she not killed, she "would be forced to live alone in squalid conditions, as single, sexually impure women in Pakistan are forced to live in shame." Moreover, the IJ erred in refusing to consider the late-filed affidavit of Hassan or Hassan's telephonic testimony, as this evidence would have corroborated Vellani's testimony.

The BIA adopted and affirmed the IJ's denial of asylum, withholding of removal, and CAT relief. The BIA did not, however, adopt the IJ's adverse credibility finding.

## II. LAW

When the BIA affirms the IJ's decision, but issues a separate opinion, as here, we review the BIA's opinion "except to the extent that [the BIA] expressly adopts the IJ's opinion." Reyes-Sanchez v. U.S. Att'y Gen., 369 F.3d 1239, 1242 (11th Cir. 2004). In reviewing the BIA's opinion, we review legal determinations de novo and factual determinations under the "substantial evidence test." See D-Muhumed v. U.S. Att'y Gen., 388 F.3d 814, 817 (11th Cir. 2004); Al Najjar v. Ashcroft, 257 F.3d 1262, 1283-84 (11th Cir. 2001). Under this test, which is "highly deferential," we "must affirm the BIA's decision if it is supported by

10

reasonable, substantial, and probative evidence on the record considered as a whole." Al Najjar, 257 F.3d at 1283-84 (quotation omitted). In order to reverse a finding of fact, "we must find that the record not only supports reversal, but compels it." Mendoza, 327 F.3d at 1287. Also, we have held that we will not consider arguments presented before the IJ or BIA but not discussed on appeal. Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1228 n.2 (11th Cir. 2005) (explaining that "[w]hen an appellant fails to offer argument on an issue, that issue is abandoned").

An alien who arrives in or is present in the United States may apply for, inter alia, asylum. INA §§ 208(a)(1), 241, 8 U.S.C. §§ 1158(a)(1). To qualify for asylum, the alien must prove that she is a refugee. Al Najjar, 257 F.3d at 1284 (citing 8 U.S.C. § 1101(a)(42)(A)). A refugee is defined in the INA as:

> any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A). To establish refugee status, the alien must establish, through specific, detailed facts, (1) past persecution on

11

account of a protected ground,[2] or (2) a "well-founded fear" that she will be persecuted in the future because of a protected ground.  8 C.F.R. § 208.13(a), (b); see Al Najjar, 257 F.3d at 1287.

A well-founded fear of future persecution may be established by showing (1) past persecution that creates a rebuttable presumption of a well-founded fear of future persecution based on a protected ground, (2) a reasonable possibility of personal persecution based on a protected ground, or (3) a pattern or practice in the subject country of persecuting members of a statutorily defined group of which the alien is a part.  8 C.F.R § 208.13(b)(1), (b)(2)(i) and (iii).  In establishing the possibility of personal persecution, the alien must present "specific, detailed facts showing a good reason to fear that he or she will be singled out for persecution." Huang v. U.S. Att'y Gen., 429 F.3d 1002, 1009 (11th Cir. 2005) (quotation omitted). In establishing a pattern or practice of persecution, the alien need not prove that she would be singled out for persecution if she demonstrates (1) a pattern or practice of persecution of similarly situated individuals and (2) that her inclusion in that group of individuals makes her fear of persecution reasonable.

---

[2] In his oral decision, the IJ stated that the acts of Amin occurred in the United States and, therefore, did not qualify as past persecution.  On appeal to the BIA, Vellani challenged this reasoning.  On appeal to this Court, however, Vellani did not address the IJ's finding that her sexual abuse in the United States did not support a past persecution claim.  Accordingly, she abandoned this issue, and we will not address whether Vellani demonstrated past persecution. See Sepulveda, 401 F.3d at 1228 n.2.

See 8 C.F.R. § 208.13(b)(2)(iii).

However, an alien does not have a well-founded fear of persecution "if the applicant could avoid persecution by relocating to another part of the applicant's country of nationality . . . , if under all the circumstances it would be reasonable to expect the applicant to do so." 8 C.F.R. § 208.13(b)(2)(ii). The alien bears the burden of establishing that it would not be reasonable for her to relocate, unless the persecution is by a government or is government-sponsored. 8 C.F.R. § 208.13(b)(3)(i). In determining whether the alien has met this burden, we must consider, but are not limited to considering, "whether the applicant would face other serious harm in the place of suggested relocation; any ongoing civil strife within the country; administrative, economic, or judicial infrastructure; geographical limitations; and social and cultural constraints, such as age, gender, health, and social and familial ties." 8 C.F.R. § 208.13(b)(3).

## III. ANALYSIS

### A. Translation

Vellani argues that the IJ violated her due process rights with regard to "the highly prejudicial translation problems that pervaded [her] individual hearing." This argument is without merit. First, the record does not support her contention that translation problems pervaded her hearing. Rather, Vellani indicated at the

start of the hearing that she could understand Urdu, the language spoken by the translator. At no point during the remainder of the hearing did Vellani repudiate this indication. Also at no point during the remainder of the hearing did Vellani, or any person, indicate that the translator was speaking a more formal version of Urdu than what Vellani indicated she understood. Indeed, the only suggestion of any translation problem was made by the friend who accompanied Vellani, who expressed concern that the translator was using the Hindi word for "sex" and that Vellani did not understand him. Vellani did not indicate that her friend's concern was accurate, and the translator indicated that he actually was using the Urdu word for "sex." Moreover, Vellani's testimony during the hearing, that Amin forced her to have "oral sex" when she refused to have "physical sex," matched her account of events in her application affidavit. Thus, the record does not establish that there actually was a translation problem.

Also, because the BIA rejected the IJ's adverse credibility finding and, therefore, presumed Vellani's testimony to be true, Vellani was not prejudiced by any translation problems in the manner alleged. See Frech v. U.S. Att'y Gen., 491 F.3d 1277, 1281 (11th Cir. 2007) (holding that "it is well settled that individuals in deportation proceedings are entitled to due process of law under the Fifth Amendment" and that "[t]o prevail on a procedural due process challenge, the

14

petitioner must show that he was substantially prejudiced by the violation"). Vellani raised the translation issue, in response to the IJ's adverse credibility finding, to argue that she hesitated before answering the questions posed only because she did not understand the translator, rather than because her story was not credible. Because the IJ's adverse credibility finding did not stand, this argument was moot.

## B. Relocation

Vellani argues that she cannot relocate because several family members have threatened to kill her, her family would pursue her throughout Pakistan, and her documentary evidence proves that honor killings occur throughout Pakistan. This argument is without merit, and substantial evidence supports the IJ's and BIA's decision that Vellani did not establish that she could not relocate reasonably to another part of Pakistan. See D-Muhumed, 388 F.3d at 817. Vellani testified that only her brother ever had threatened to kill her. Also, Vellani never suggested or demonstrated that her brother threatened to track her down to do so. Therefore, it is irrelevant that honor killings occur throughout Pakistan, as Vellani has not argued that people throughout Pakistan wish to kill her to avenge the dishonor of her family. Thus, the record provides no reason to doubt that Vellani could avoid the threat of an honor killing by moving to a place in Pakistan other than where

her brother resided.  See 8 C.F.R. § 208.13(b)(2)(ii), (3)(i).

We note that, before the IJ and BIA, Vellani appeared to argue that, while she could avoid the threat her brother posed by relocating to another part of Pakistan, it was not reasonable to expect her to relocate because she would be forced to live alone without any means of supporting herself.  On appeal to this court, however, Vellani did not pursue this line of reasoning.  In her appellate brief, Vellani did not argue that she could not relocate to any area of Pakistan because of the stigma or hardship of living alone as a woman.  Rather, Vellani only argued that she could not relocate because she risked an honor killing in any part of Pakistan, which is an insufficient argument, as discussed above.  Accordingly, she abandoned this argument, and we will not address whether it was reasonable to expect Vellani to relocate to another part of Pakistan where she would be forced to live alone.  See Sepulveda, 401 F.3d at 1228 n.2.

### C. Hassan's Affidavit and Testimony

Vellani argues that the IJ violated her due process rights by refusing to consider  Hassan's affidavit or telephonic testimony.  This argument is without merit.  The record demonstrates that the IJ's refusal to consider this evidence did

16

not prejudice Vellani.  See Frech, 491 F.3d at 1281.[3]  The record demonstrates that Hassan's affidavit and telephonic testimony would not have altered the IJ's and BIA's conclusions that Vellani could avoid the threat of an honor killing by moving to another part of Pakistan.  See id.  In the affidavit, Hassan stated that it was highly probable that "grievous bodily harm," in the form of an honor killing, would be done Vellani by her brother and/or Amin's relatives and associates if she returned to Pakistan.  This statement would not alter the IJ's and BIA's conclusions because, as stated above, Vellani never argued that anyone other than her brother would kill her, and because the statement does not suggest that Vellani's brother would follow her wherever she went in Pakistan to exact his vengeance.  Likewise, regarding Hassan's telephonic testimony, the record suggests no reason to believe that Hassan would have been able to testify that Vellani's brother had threatened to follow Vellani anywhere in Pakistan to kill her, especially as Vellani herself never indicated as much.  Therefore, Vellani was not prejudiced by the IJ's refusal to consider these submissions.  See Frech, 491 F.3d at 1281.

---

[3] Along with Hassan's affidavit and testimony, the IJ also refused to consider a late-filed letter from a counselor.  On appeal to this Court, Vellani did not address this refusal. Accordingly, Vellani abandoned any argument that the IJ violated her due process rights by failing to consider this letter, and we will not address the matter.  See Sepulveda, 401 F.3d at 1228 n.2.

## D. Withholding of Removal and CAT relief

On appeal to this court, Vellani does not address the IJ's or BIA's denial of withholding of removal or CAT relief. Accordingly, Vellani abandoned any argument that the IJ and BIA erred in denying these forms of relief, and we will not address these decisions.

**PETITION DENIED.**